# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| **CATHERINE LEONIE NANTUME,** | ) | |
| | ) | |
| **Petitioner,** | ) | **Civil Action No.** |
| | ) | **18-11363-FDS** |
| **v.** | ) | |
| | ) | |
| **YOLANDA SMITH,** | ) | |
| | ) | |
| **Respondent.** | ) | |

_____)

## MEMORANDUM AND ORDER ON PETITIONER'S
## PETITION FOR A WRIT OF HABEAS CORPUS

**SAYLOR, J.**

This is a habeas petition involving an immigration matter. Petitioner Catherine Nantume is a Ugandan citizen who is subject to a final order of removal from the United States. She has filed a petition for a writ of habeas corpus challenging her detention by immigration authorities.

Nantume has an extensive history of immigration fraud. She entered the United States on October 2, 2001. In 2002, she entered into a sham marriage with a United States citizen. She used that "marriage" to obtain permanent residency status in 2007; she later applied to be naturalized as a citizen. Before that could happen, however, she was indicted for conspiring to defraud the United States.

Her trial took place in March 2012 in the District of Maine. Although she was not required to do so, she took the stand and testified. She claimed that the marriage was real, and told a detailed story about meeting and falling in love with her husband (who, in truth, she met the day of the wedding). The jury nonetheless convicted her on March 28, 2012.

During the sentencing phase of her case, Judge Woodcock issued an opinion concluding

that her story was entirely false, and that she had perjured herself at least 17 times as to specific facts.  She was ultimately sentenced to a one-year term of imprisonment.

Nantume completed her sentence in 2014; she was then taken into ICE custody.  On May 12, 2014, an immigration judge ordered her removal to Uganda.

On July 30, 2014, Nantume moved to reopen her removal proceeding.  She claimed, for the first time, that she had recently realized that she was a lesbian, and sought asylum on the ground that gays and lesbians are subject to persecution in Uganda.[1]  The immigration judge denied her motion to reopen, and the U.S. Board of Immigration Appeals ("BIA") subsequently dismissed her appeal.

However, ICE was unable to secure necessary travel documents from the Ugandan government to effectuate the removal order at that time.  Accordingly, she was released in November 2014, subject to various reporting conditions.

On May 1, 2018, ICE was notified that Uganda would issue the travel documents once Nantume was taken into custody.  ICE then arrested her on May 31, 2018.

She filed this habeas petition pursuant to 28 U.S.C. § 2241.  The petition chiefly raises procedural and substantive due-process claims under the Fifth Amendment.  In substance, Nantume contends that her detention is unconstitutional and that she should be released immediately.

In the meantime, on June 25, 2018, Nantume also filed a renewed motion to reopen her case, and a motion to stay her removal, with the BIA.  Again, the basis for those motions is her

---

[1] This matter was filed under seal, ostensibly to guard against the public identification of Nantume as a lesbian.  At the outset of the hearing—which was public and well-attended—the Court raised the question of whether the matter should remain sealed in its entirety.  After a colloquy, the Court indicated that it would simply refer to her sexual orientation as a "private fact," without indicating the nature of her claim, in order to prevent unnecessary disclosure.  Nonetheless, partway through the public hearing, her counsel began to refer openly to her as "LGBT" and "gay."  There is, accordingly, no apparent reason to refrain from disclosing her sexual orientation or the nature of her asylum claim.

contention that she will suffer persecution as a lesbian if forced to return to Uganda.

There are three basic issues in these proceedings.  The first is whether Nantume is being held illegally in violation of the Constitution and laws of the United States.  It is emphatically clear that this Court has jurisdiction to decide that question.  The second issue is whether Nantume should be granted asylum in the United States; the third is whether her removal should be stayed pending resolution of the asylum question.  As to those issues, it is equally clear that this Court is without jurisdiction.  By law, the power to establish immigration controls, and to establish a process for resolving immigration disputes, rests with Congress, subject only to the restraints of the Constitution.  Congress has created a statutory procedure that does not include a role for the district courts; indeed, it has expressly stripped district courts of jurisdiction to hear such disputes.  Such issues are remitted by law to the immigration authorities, subject to review by the Courts of Appeals.

Nantume has not formally moved in this Court to reopen her case or to stay her removal.  Instead, she made those requests to the proper authority, the BIA.  Those motions remain pending.  Nonetheless, at oral argument in the hearing of this case, her counsel described her sympathetic circumstances and requested that this Court employ its equitable powers to stay her removal and keep her in the United States.  When the Court questioned its power to do so, counsel responded in substance that the Court was taking an unduly narrow and myopic view of its jurisdiction, and that it was up to the Court to prevent a grave injustice.  That argument, although not made as a formal motion, deserves a thoughtful response.

The persecution and mistreatment of gays and lesbians in Uganda, and throughout much of Africa and the Middle East, is well-documented.[2]  It is yet another chapter in the long

---

[2] The 2017 Department of State Human Rights Report on Uganda noted that one of the most significant human rights issues in the country was the "criminalization of same-sex consensual conduct, including security

catalogue of human cruelty and misery across the globe.  By contrast, the United States,

whatever its imperfections, is a free and tolerant society—not just of gays and lesbians, but of

minorities generally.  The United States is also, of course, a safe, stable, and economically

prosperous nation, and its people, on the whole, are generous and compassionate.

Not surprisingly, millions of individuals attempt to enter and remain in the United States,

legally and illegally, seeking to avoid discrimination, sexual abuse, torture, war, famine, extreme

poverty, or even genocide.  Many of those individuals apply for asylum to avoid returning to

their home countries.  It is no exaggeration to say that virtually all of those cases involve

sympathetic facts, many to a high degree.  Virtually all of the applicants will be worse off, and

many will be in danger, if they are forced to return.  And many, if not most, immigration matters

involve separated families.[3]  But because our borders are not completely open, not everyone can

be admitted.  Someone—that is, some government official or board—has to decide which claims

are sufficiently meritorious to be granted.

So it is here.  Someone has to decide whether Nantume is telling the truth in connection

with her claim for asylum; whether she will be subject to persecution if she returns to Uganda;

whether she should be granted asylum in the United States; and whether her removal should be

stayed pending those decisions.  By law, those questions are not to be resolved by a United

States District Judge; they are to be resolved by immigration authorities (in this case, the BIA),

subject to judicial review by the United States Court of Appeals.

Put simply, there is a procedure to address such claims, and that procedure does not

---

force harassment and detention of lesbian, gay, bisexual, transgender, and intersex persons."  (Pet. Mem. Ex. G, at
68).  It also found that gays "faced discrimination, legal restrictions, societal harassment, violence, and
intimidation." (*Id.* at 102).

[3] Nantume has a nine-year-old child who was born in the United States and is thus a citizen.

involve this Court.  The Court is unwilling to ignore or defy the law, even in highly sympathetic circumstances. [4]  To do so would be a fundamental violation of its most basic responsibilities.

There is, however, a role for this Court, and that is to determine whether Nantume is being detained in violation of the Constitution and laws of the United States, such that release from custody is warranted.  For the reasons set forth below, the Court finds that she is not.  Accordingly, the petition will be dismissed.

## I.   **Background**

### A.   **Factual Background**

Catherine Nantume is a citizen of Uganda.  (Pet. ¶ 8).  She entered the United States on October 2, 2001, on a visitor visa.  (Nantume Mot. to Reopen Aff. ¶ 14).  That visa expired on April 1, 2002.  (*Id.*).

On August 19, 2002, she entered into a sham marriage with Timothy Dancsak in Auburn, Maine.  *See United States v. Nantume*, 2012 WL 4794226, at *1 (D. Me. Oct. 9, 2012).  Dancsak was paid $500 to marry Nantume.  (*Id.*).

Subsequently, Nantume and Dancsak attended an interview with Citizenship and Immigration Services ("CIS") on March 4, 2004, to obtain a change in Nantume's immigration status based on marriage.  (*Id.*).  CIS granted that request, allowing her conditional residency status as of March 4, 2004.  (*Id.*).  Sometime afterward, she filed a petition for permanent residency status; in that petition, she represented that she and Dancsak were still living together.  (*Id.*).  CIS granted that petition on January 23, 2007, and she became a lawful permanent resident

---

[4] To be sure, there are ample reasons to question Nantume's story.  She has not only committed immigration fraud, by entering into a sham marriage and using that marriage to obtain a green card and apply for citizenship; she told an elaborate set of lies, under oath, in her criminal trial.  And she continues to perpetuate at least some of those falsehoods in her current immigration proceeding, as described below.  But whether she is telling the truth as to her sexual orientation and other circumstances of her life is not for this Court to decide.

of the United States.  (*Id.*).  On January 14, 2010, Nantume filed a petition with CIS to become a naturalized citizen.  (*Id.*).

On June 15, 2011, the United States Attorney's Office for the District of Maine filed an indictment charging Nantume with one count of defrauding the United States by entering into a sham marriage to gain citizenship.  *See* Docket No. 1, *United States v. Nantume*, No. 11-cr-00092-JAW (D. Me.).  After a three-day trial, she was convicted on March 28, 2012.  *See Nantume*, 2012 WL 4794226, at *1.

Before sentencing, on October 9, 2012, Judge Woodcock issued an opinion making factual findings that Nantume had committed perjury.  *Id.*[5]  He found that her "version of the facts [was] utterly fanciful" and that she "repeatedly and consciously lied under oath during her federal trial."  *Id.* at *11.[6]  He further identified 17 specific facts about which she had lied.  *Id.* at *11-12.[7]  Judge Woodcock concluded that she "knowingly, willfully, and repeatedly lied under oath . . . to fool the jury into acquitting her."  *Id.* at *12.  He ultimately imposed a two-level enhancement for obstruction of justice in accordance with § 3C1.1 of the Sentencing Guidelines.  *Id.*

Nantume was sentenced to a term of imprisonment of one year, followed by a term of supervised release of three years.  *See* Docket No. 83, *United States v. Nantume*, No. 11-cr-00092-JAW (D. Me.).  That same day, she filed a notice of appeal.  *See* Docket No. 87, *United States v. Nantume*, No. 11-cr-00092-JAW (D. Me.).  The conviction and sentence were affirmed

---

[5] Because the findings were made for the purpose of a sentencing enhancement, they were made by a preponderance of the evidence.

[6] Judge Woodcock noted that five witnesses directly contradicted Nantume's testimony.  *See Nantume*, 2012 WL 4794226, at *6-8.  By contrast, the only witness who corroborated Nantume's testimony was her own mother, Asha Kiwanuka.  *See id.* at *9.

[7] One such fact was that she met Dancsak while partying with her Ugandan friends in Massachusetts.  *Id.* at *11.

by the First Circuit on October 31, 2013.  *See* Docket No. 99, *United States v. Nantume*, No. 11-cr-00092-JAW (D. Me.).

Because of that conviction, Immigrations and Customs Enforcement ("ICE") initiated removal proceedings against Nantume.  On May 12, 2014, an Immigration Judge ("IJ") found that she was removable pursuant to INA §§ 223(a)(2)(A)(i), 237(a)(1)(A), and 237(a)(1)(G)(ii).  (Pet. ¶ 19).  The IJ further ordered that she be removed to Uganda.

On July 30, 2014, Nantume filed a motion to reopen her immigration proceedings to apply for asylum under the Convention Against Torture.  (*Id.* ¶ 20).  In her motion to reopen, she stated for the first time to immigration authorities that she had recently realized she was a lesbian and feared for her safety if she was removed to Uganda.  (*See* BIA Order at 2).  That motion was denied on August 11, 2014.  (Pet. ¶ 21).

On September 10, 2014, Nantume appealed the IJ's denial to the Board of Immigration Appeals ("BIA").  (*Id.* ¶ 22).  Around that time, the ICE Office of Enforcement and Removal Operations ("ERO") planned to effectuate her removal to Uganda.  (*Id.* ¶ 23).  However, the Ugandan government cancelled her travel documents, preventing the removal.  (*Id.*).

Because ICE was unable to obtain the necessary travel documents, Nantume was released subject to an order of supervision on November 24, 2014.  (*Id.* ¶ 24).  When she was released, she was given a document titled "Release Notification."  The document stated, among other things, as follows:

> ICE will continue to make efforts to obtain your travel document that will allow the United States government to carry out your removal pursuant to your order of deportation, exclusion, or removal. . . .  Once a travel document is obtained, you will be required to surrender to ICE for removal.  You will, at that time, be given an opportunity to prepare for an orderly departure.

(Pet. Resp. Ex. 4 at 1).

The BIA dismissed her appeal on February 6, 2015.  (Pet. ¶ 25).  In its opinion, the BIA agreed with the IJ that Nantume had not made a *prima facie* showing that she was statutorily eligible for her proceedings to be reopened.  (BIA Order at 2-3).  In particular, the BIA found that her affidavit, which stated that she did not realize she was a lesbian until she was detained by ICE, was not credible.  (*Id.*).

Over the next three and a half years, Nantume regularly checked in at the ERO office in Burlington, Massachusetts.  (Pet. ¶ 26).  There is no evidence that she violated any condition of her release.

On May 1, 2018, the Burlington ERO office received notice that the Ugandan government would issue a travel document for Nantume "*after* she was in ICE custody." (Greenbaum Decl. ¶ 6) (emphasis added).  In order to effectuate her final removal, ICE arrested Nantume on May 31, 2018.  (*Id.* ¶ 4).  She was not given an opportunity to self-report.

At the time of the arrest, Nantume was given a Notice of Revocation of Release.  (*Id.* ¶ 5).[8]  At the same time, ICE "explained the reasons why [it] was revoking her Order of Supervision and offered Nantume an opportunity to respond to such reasons." (*Id.* ¶ 7).  ICE characterizes that meeting as an initial "informal interview."  (Greenbaum Supp. Decl. ¶ 5).  The following day, Nantume's attorney, Melanie Shapiro, contacted the Ugandan embassy to see whether the Ugandan government had issued the travel documents necessary for removal.  (Pet. ¶ 29).  As of June 5, 2018, no such documents had been issued.  (*Id.* ¶ 30).

On June 8, 2018, ICE sent a travel document request to the Ugandan consulate. (Greenbaum Decl. ¶ 8).  In turn, the Ugandan government requested a travel itinerary and passport-style photos in order to issue the documents.  (*Id.*).  ICE then requested a travel itinerary

---

[8] The Notice of Revocation of Release is not part of the record.

from the ICE travel contractor.  (*Id.*).

On June 12, 2018, ERO served a "Notice to Alien of File Custody Review" on Nantume. (Pet. Resp. Ex. 4 at 2).  The notice stated that "[y]our custody status will be reviewed on or about 8/29/2018."  (*Id.*).  The notice was not faxed to Attorney Shapiro until June 27, 2018.  (Pet. ¶ 34).

On June 25, 2018, Nantume filed a second motion to reopen her immigration proceedings with BIA on the basis of changed country circumstances.  (*Id.* ¶ 31).  She cited to a 2017 State Department human rights report stating, among other things, that Uganda had criminalized same-sex conduct.  *See* Nantume Mot. to Reopen at 7.  That same day, she also filed for an emergency stay from the BIA.  (Pet. Mem. Ex. F).  Included with her application was an affidavit containing a statement Judge Woodcock already found to be false—namely, that she had met Dancsak during a party on New Year's Eve in 2001.  (Nantume Mot. to Reopen Aff. ¶ 15).

On June 28, 2018, Office Timothy Baptiste conducted an interview with Nantume.  (Pet. ¶ 36; Greenbaum Decl. ¶ 7).  Attorney Shapiro participated in at least part of the interview by telephone.  (Greenbaum Decl. ¶ 7).  Nantume characterizes this as the "initial informal interview," but ICE contends that it was a "further interview" to follow-up on the interview held on May 31, 2018.  (Pet. ¶ 36; Greenbaum Supp. Decl. ¶ 5).

The ICE travel contractor provided an itinerary on July 16, 2018, which states that Nantume will depart within the next 10 days.  (Greenbaum Supp. Decl. ¶ 6).  The itinerary and passport photos were transmitted to the Ugandan government on July 17, 2018.  (*Id.*). ICE anticipates that the travel documents necessary for removal will be issued imminently.  (*Id.* ¶ 7).

### B.    Procedural Background

Nantume filed the present petition on June 28, 2018.  The petition alleges multiple due-

process violations.  First, the petition alleges that Nantume was not given an "initial informal interview" until June 28, 2018, and that there was no advance notice given to either her or Attorney Shapiro in violation of federal immigration regulations.  (Pet. ¶¶ 42-46).   Second, it alleges a substantive due-process violation, stating that Nantume's removal is not reasonably foreseeable.  (*Id.* ¶¶ 47-51).  Third, it alleges a procedural due-process violation, alleging that Nantume was denied an opportunity to show why detention is unwarranted.  (*Id.* ¶¶ 52-53).  Finally, the petition alleges that Nantume's continued detention is "arbitrary" because there is no valid justification.  (*Id.* ¶¶ 54-57).

The case was assigned to the undersigned judge on June 29, 2018.  That day, the Court dismissed all named respondents except for Yolanda Smith, the Superintendent of the Suffolk County House of Correction.  (Docket No. 7).

On July 2, 2018, Nantume filed an emergency motion for a temporary restraining order and preliminary injunction.  Judge Talwani, as the emergency duty judge, entered an order directing respondent to file an opposition by July 6, 2018.  This Court then granted respondent an additional week to file a response.

A hearing was held on July 17, 2018, during which the Court granted the parties an additional day to submit supplemental briefs concerning any factual or legal disputes.

## II.  <u>Analysis</u>

### A.   <u>Lack of Jurisdiction over Challenges to Removal Proceedings</u>

In 2005, Congress passed the REAL ID Act, which stripped federal district courts of jurisdiction to review challenges by aliens to their final orders of removal.  *See Ishak v. Gonzales*, 422 F.3d 22, 27-28 (1st Cir. 2005) ("[T]he REAL ID Act [ ], in the plainest of language, deprives the district courts of jurisdiction in removal cases."); 8 U.S.C. § 1252(a)(5).

The statute provides:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, . . . , no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

*Id.* § 1252(g).

Congress has provided a statutory process to handle immigration disputes that takes place entirely in immigration courts and the BIA, subject to judicial review by the Courts of Appeals. Petitioners must first exhaust "all administrative remedies available to the alien as of right" through the immigration courts and BIA. *Id.* § 1252(d)(1). The immigration courts and BIA can reopen removal proceedings on the basis of "new facts." 8 C.F.R. §§ 1003.2(c), 1003.23(b)(3). They can also grant stays of removal. *Id.* §§ 1003.2(f), 1003.23(b)(1)(v). Judicial review comes in the form of a "petition for review" filed with the Courts of Appeals. *See* 8 U.S.C. § 1252(a)(5) ("[A] petition for review filed with an appropriate court of appeals . . . shall be the sole and exclusive means for judicial review of an order of removal . . . except as provided in subsection (e).").

However, district courts retain habeas jurisdiction "over challenges to the legality of detention in the immigration context." *Aguilar v. U.S. Immigration and Customs Enforcement Div. of the Dep't of Homeland Sec.*, 510 F.3d 1, 11 (1st Cir. 2007). Accordingly, while the Court may not review ICE's decision to execute Nantume's removal order, it may consider her constitutional challenges to her detention. *See Rombot v. Moniz*, 299 F. Supp. 3d 215, 217 (D. Mass. 2017).[9]

---

[9] Nantume does not contend that any immigration procedures to which she was subjected before her arrest in May 2018 violated the Constitution.

**B.**      **Count One—Alleged Statutory Violations**

In Count One, Nantume alleges that ICE committed two violations:  first, that she and her counsel were entitled to notice in advance of the "initial informal interview," and second, that she may not be removed because "he[r] life or freedom would be threatened" in light of her sexual orientation.  (Pet. ¶¶ 43, 46).

**1.**      **The Claimed Requirement to Give Advance Notice of an Initial Informal Interview**

In the petition, Nantume relies on 8 C.F.R. §§ 241.4 and 241.13 for the proposition that she and Attorney Shapiro should have been given notice of the informal interview.[10]

In its entirety, 8 C.F.R. § 241.13(i)(3) provides as follows:

> Upon revocation, the alien will be notified of the reasons for revocation of his or her release.  [ICE] will conduct an initial informal interview promptly after his or her return to [ICE] custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification.  The alien may submit any evidence or information that he or she believes shows there is no significant likelihood he or she be removed in the reasonably foreseeable future, or that he or she has not violated the order of supervision.  The revocation custody review will include an evaluation of any contested facts relevant to the revocation and a determination whether the facts as determined warrant revocation and further denial of release.

The regulation only mandates that upon revocation of release, the petitioner must be given an initial opportunity to dispute the government's justification for revocation.  There is no requirement that ICE give any advance notice of the informal interview either to a petitioner or her counsel.

Next, Nantume contends that she and her counsel should have been given 30 days' notice to "submit information in writing to contest the grounds for revocation of release and challenge

---

[10] As set forth below, there is a factual dispute between the parties; respondent contends that the interview occurred on May 31, 2018, while Nantume contends that the interview did not take place until June 28, 2018. (Greenbaum Decl. ¶ 7; Greenbaum Supp. Decl. ¶ 5; Pet. ¶ 36).

custody." (Pet. ¶ 45). In support, she relies on 8 C.F.R. § 241.4(h)(2) , which states:

> The district director or Director of the Detention and Removal Field Office will provide written notice to the detainee approximately 30 days in advance of the pending records review so that the alien may submit information in writing in support of his or her release. The alien may be assisted by a person of his or her choice, subject to reasonable security concerns at the institution and panel's discretion, in preparing or submitting information in response to the district director's notice. Such assistance shall be at no expense to the Government. If the alien or his or her representative requests additional time to prepare materials beyond the time when the district director or Director of the Detention and Removal Field Office expects to conduct the records review, such a request will constitute a waiver of the requirement that the review occur prior to the expiration of the removal period.

This regulation does not require that a petitioner or her counsel be given 30 days' notice prior to the initial informal interview. Rather, it solely provides that 30 days' notice be given prior to the "pending records review." Here, Nantume was served the "Notice to Alien of File Custody Review" on June 12, 2018, 78 days prior to the August 29, 2018 records review. (Pet. Resp. Ex. 4 at 2). That same document was provided to Attorney Shapiro on June 27, 2018, 63 days prior to August 29, 2018. (Pet. ¶ 34). Accordingly, there was no regulatory violation with respect to either the initial informal interview or the notice requirement for the records review.

### 2.      The Claim under 8 U.S.C. § 1231(b)(3)(A) That Removal Will Result in Persecution

Embedded in Count One is a claim that Nantume cannot be removed because she would be subject to persecution in Uganda on account of her sexual orientation. (Pet. ¶ 46). 8 U.S.C. § 1231(b)(3)(A) states that "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's . . . membership in a particular social group . . . ." "To be eligible for withholding of removal under § 1231(b)(3)(A), an alien must show by a clear probability that her life or freedom would be threatened in [the country to which she would be removed] because of

the alien's . . . membership in a particular social group . . . ."  *Marroquin-Rivera v. Sessions*, 861

F.3d 7, 8 (1st Cir. 2017).

However, this is substantively an attempt to reopen Nantume's removal proceedings on

the basis of "new facts."  The authority to reopen proceedings lies with the immigration courts

and BIA.  8 C.F.R. §§ 1003.2(c), 1003.23(b)(3).  As described earlier, Nantume raised the issue

of her sexual orientation only after she was detained by ICE and the IJ found her removable.

The IJ and BIA found her statements insufficient to warrant reopening proceedings.  At that

point, she could have sought judicial review by filing a petition for review with the First Circuit.

*See* 8 U.S.C. § 1252(a)(5).  For whatever reason, no such petition was filed.  And, as noted, she

filed another motion to reopen on June 25, 2018.

Because the law restricts district courts from addressing such a claim, Count One will be

dismissed in its entirety.

### C.     Counts Two and Four—Substantive Due Process

In Count Two, Nantume contends that her substantive due-process rights have been

violated because her removal is "not significantly likely to occur in the reasonably foreseeable

future."  (Pet. ¶ 49).  Count Four appears to raise a similar substantive due-process claim,

alleging that her continued detention is arbitrary.  (*Id.* ¶¶ 54-57).

Nantume's chief argument is that the government has not shown that her removal is

reasonably foreseeable, as required under *Zadvydas v. Davis*, 533 U.S. 678, 699 (2001).[11]  In

*Zadvydas*, the Supreme Court stated that "once removal is no longer reasonably foreseeable,

continued detention is no longer authorized by statute."  *Id.*  The Court set a presumptive limit of

---

[11] The government disputes that *Zadvydas* is applicable because she has been detained for less than two months.  (Resp. Opp. at 4).  *See Penate-Diaz v. Moniz*, 2018 WL 889217, at *2 (D. Mass. Feb. 12, 2018) (Gorton, J.) (stating that where an alien has been in immigration detention awaiting removal for less than six months, continued detention is presumptively reasonable).

six months for the detention of aliens.  *Id.* at 701.  After the six months elapse, the alien would

have an opportunity to demonstrate that there is "no significant likelihood of removal in the near

future."  *Id.*  The government would have to then provide sufficient evidence to rebut that

showing.  *Id.*

  This case, however, involves an entirely different fact pattern from *Zadvydas*.  The

relevant regulation, 8 C.F.R. § 241.13(i)(2), provides that ICE "may revoke an alien's release

under this section and return the alien to custody if, on account of changed circumstances, the

Service determines that there is a significant likelihood that the alien may be removed in the

reasonably foreseeable future."  ICE has represented—without contradiction—that on May 1,

2018, it received notice from ERO headquarters that the Ugandan government would issue the

necessary travel documents to effect Nantume's removal *after* she was taken into custody.

(Greenbaum Decl. ¶ 6).  A travel itinerary has since been issued by ICE's travel contractor, and

the itinerary and passport-style photos were transmitted to the Ugandan embassy.  (Greenbaum

Supp. Decl. ¶¶ 6-7).  Removal is expected to soon follow.  (*Id.* ¶ 7).

  Nantume's only response is to point out that in 2014, after she was ordered removed, the

Ugandan government cancelled her travel documents.  (Pet. Resp. at 6).  In addition, ICE had not

procured the necessary travel documents over the past four years.  (*Id.*).  But that is not sufficient

to show that ICE's decision to revoke her release was arbitrary or capricious, or otherwise

improper.  Circumstances have in fact changed, and removal appears imminent.

  In short, it is clear that there were sufficient "changed circumstances" to permit ICE to

determine that there was a "significant likelihood" of removal in the near future.  Accordingly,

the revocation of Nantume's release was proper, and Counts Two and Four will be dismissed.

  Of course, it is incumbent upon ICE to immediately notify Nantume if Uganda declines

to issue the travel documents or, for whatever reason, removal is no longer likely to occur in the near future.  However, when the underlying removal order is valid and removal is imminent, release is not warranted.

Nantume further contends that there are "good reasons not to automatically detain . . . her for 90 days before considering [her] release."  (Pet. Resp. at 7) (quoting *Jimenez v. Cronen*, 2018 2899733, at *18 (D. Mass. June 11, 2018)).  However, that argument largely focuses on alleged procedural due-process violations, which the Court will separately address.

### D.   Count Three—Procedural Due Process

In Count Three, Nantume alleges that ICE has committed multiple procedural due-process violations.  She appears to contend that (1) ICE did not provide her with an initial interview, and thus denied her an opportunity to contest her detention; (2) the determination of her custody status should have been made by a neutral arbiter; (3) she was not given an "opportunity to prepare for an orderly departure"; and (4) ICE did not make a threshold finding that her detention was in the "public interest."  (Pet. ¶ 53; Pet. Resp. at 7-8).  The Court will address each argument in turn.

### 1.   The Claimed Lack of an Informal Interview

Nantume first contends that she was "entitled to a timely and meaningful opportunity to demonstrate that . . . she should not be detained."  (Pet. ¶ 53).  She appears to rely on 8 C.F.R. § 241.13(i)(3), which requires that ICE conduct an "initial informal interview" promptly after the alien's return to custody.

Again, ICE contends that the initial informal interview was administered on May 31, 2018, soon after Nantume's arrest.  (Greenbaum Decl. ¶ 7; Greenbaum Supp. Decl. ¶ 5).  Nantume contends that there was no initial informal interview until June 28, 2018.  (Pet. ¶ 36).

16

However, the only evidence before this Court as to that issue are sworn declarations from the Assistant Field Office Director of the Burlington ICE office stating that the interview took place on May 31, 2018.  Neither party has requested a factual hearing on this matter.  It therefore appears, based on the record before the Court, that ICE complied with the regulation.

In any event, even assuming that the initial informal interview was not given until June 28, 2018, it is difficult to see an actionable injury stemming from such a violation.  Nantume is not challenging the underlying justification for the removal order (although she seeks to reopen the proceeding).  Nor is this a situation where a prompt interview might have led to her immediate release—for example, a case of mistaken identity.  There is thus no apparent reason why a violation of the regulation, even assuming it occurred, should result in release.

The regulations further provide that ICE must conduct a "custody review" within 90 days of revocation.  8 C.F.R. § 241.4(k).  In accordance with that regulation, ICE scheduled the custody review for "on or about" August 29, 2018.  At that time, Nantume may present any documentation or other evidence in support of her contention that continued detention is unwarranted.

Accordingly, there is no evidence of an actionable violation of a regulation, and this sub-claim does not raise a procedural due-process violation.

### 2.    <u>The Claim of Lack of a Neutral Decision-Maker</u>

Nantume next contends that she was entitled to a "neutral decision-maker" to review her continued custody.  (Pet. ¶ 53).  It is unclear what she means by that; for example, she has made no allegation of unfair bias on the part of the IJ or the BIA.  And she has not provided any authority, and this Court is unaware of any, for the proposition that ICE must provide decision-makers independent of the immigration system to review detention proceedings.  Again, 8 C.F.R.

§ 241.4 is the sole authority governing the continued detention of aliens.  Therefore, this sub-claim must also fail.

### 3.   The Claim of Failure to Provide an Opportunity to Prepare for an Orderly Departure

Nantume further contends that ICE violated her procedural due-process rights when it arrested her on May 31, 2018, without providing "an opportunity to prepare for an orderly departure."  (Pet. Resp. at 7).  As noted earlier, when Nantume was released from detention in 2014, she was given a document titled "Release Notification."  The document stated that:

> ICE will continue to make efforts to obtain your travel document that will allow the United States government to carry out your removal pursuant to your order of deportation, exclusion, or removal. . . .  Once a travel document is obtained, you will be required to surrender to ICE for removal.  *You will, at that time, be given an opportunity to prepare for an orderly departure.*

(Pet. Resp. Ex. 4 at 1) (emphasis added).  The parties agree that there is no statute or regulation requiring ICE to provide such an opportunity.

Nevertheless, when Nantume was arrested, she was not permitted to self-report, or given any advance notice—rather, she was taken directly into custody.  In a similar case, Judge Saris found that ICE's failure to provide sufficient notice of revocation in direct contravention to the language of the Release Notification constituted a procedural due-process violation.  *See Rombot v. Souza*, 296 F. Supp. 3d 383, 388 (D. Mass. 2017). [12]

There is at least some doubt whether a constitutional right can be created by such a notice.  It is also unclear what, exactly, constitutes an "orderly departure," or an "opportunity to prepare" for such a departure.  Nonetheless, the Court will assume, without deciding, that

---

[12] Judge Saris's memorandum and order ordered release from detention as a remedy for the violation, without discussion or analysis.  For the reasons set forth in this memorandum, this Court respectfully disagrees that such a remedy is appropriate.

Nantume's due-process rights were violated when the government promised that she would receive an opportunity to prepare for an "orderly departure," but nonetheless failed to do so and arrested her without notice.

It does not follow, however, that such a violation requires the remedy of release from custody.  There is no doubt that immigration authorities had the right to take her into custody, whether by permitting her to self-report or by arresting her immediately.  The only issue is the means of effectuating the arrest.  But an improper method of arrest (as opposed to lack of authority for the arrest) does not normally result in the release of the arrestee.  For example, government agents (with dismaying frequency) violate the constitutional rights of arrestees by using excessive force; the remedy for such a violation is not release from detention, but rather an action under 42 U.S.C. § 1983 or *Bivens* against the individual officers for money damages. There is no apparent reason to treat this circumstance differently.  Nantume, conceivably, could bring a *Bivens* action for damages, but the relatively extreme remedy of release from custody— which might defeat the removal process entirely—is unwarranted.[13]

Accordingly, even assuming a due-process violation based on ICE's failure to comply with the statement in the Release Notification that Nantume would be provided with "an opportunity to prepare for an orderly departure," there is no basis to order a remedy in the form of release from custody.

### 4.    The Claimed Failure to Make a Formal Finding that Revocation Was in the "Public Interest"

Finally, Nantume contends that ICE was required to "consider [the] public interest" before revoking her release.  (Pet. Resp. at 8).  Specifically, she relies on *Rombot*, in which

---

[13] The Ugandan government has stated that it would issue travel documents once Nantume was in custody. If she is released, it is unclear whether those documents would be forthcoming.

Judge Saris found that the ICE Field Office Director should have made a "threshold determination" that revocation was "in the public interest." *Rombot*, 296 F. Supp. 3d at 387.

The applicable regulation governing revocation of release is 8 C.F.R. § 241.4(l)(2).  That regulation provides as follows:

> The Executive Associate Commissioner shall have authority, in the exercise of discretion, to revoke release and return to [ICE] custody an alien previously approved for release under the procedures in this section.  A district director may also revoke release of an alien when, in the district director's opinion, revocation is in the public interest and circumstances do not reasonably permit referral of the case to the Executive Associate Commissioner.  Release may be revoked in the exercise of discretion when, in the opinion of the revoking official:
>
> (i) The purposes of release have been served;
>
> (ii) The alien violates any condition of release;
>
> (iii) It is appropriate to enforce a removal order or to commence removal proceedings against an alien; or
>
> (iv) The conduct of the alien, or any other circumstance, indicates that release would no longer be appropriate.

Here, Nantume argues that the district director was required to make a formal determination that her revocation was in the public interest.  However, § 241.4(l)(2) imposes no such requirement.  Rather, it gives directors discretion to determine when revocation is appropriate, including to "commence removal proceedings against an alien."  As noted earlier, the Burlington ICE Office determined that revocation was necessary to initiate Nantume's removal.  (Greenbaum Decl. ¶¶ 5-6).  No further justification was required.  Accordingly, this sub-claim will be dismissed.

In short, the Court concludes that ICE did not violate any relevant regulation, statute, or constitutional requirement, and that even assuming that a technical violation may have occurred, there is no basis for ordering release from detention as a remedy.  And to the extent that

Nantume seeks to stay or prevent her removal based on the merits, this Court is without subject-matter jurisdiction to consider such a claim.

**III.**   **Conclusion**

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED, and the action is dismissed.

**So Ordered.**

/s/  F. Dennis Saylor
F. Dennis Saylor IV

Dated: July 19, 2018                                    United States District Judge